**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHELLE PICKENS, INDIVIDUALLY, | § | |
| AND AS REPRESENTATIVE OF | § | |
| THE ESTATE OF NEHEMIAH | § | |
| PICKENS, DECEASED, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-05-2978 |
| | § | |
| HARRIS COUNTY and | § | |
| WALLACE E. JONES, JR., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case arises from a "friendly-fire" incident.  A deputy sheriff chasing an unarmed suspect shot and killed a second person who was running in the same direction as the suspect and carrying a gun.  The deputy asserts that he pulled his own weapon and fired only after the second person failed to obey commands to drop his weapon and appeared to be preparing to shoot.  After the shooting, the second person was discovered to be an off-duty volunteer reserve deputy constable.

Although many of the facts surrounding the shooting are disputed, some facts are uncontroverted.  The reserve deputy constable was off-duty, armed, and not in uniform.  He intervened in an ongoing chase of an unarmed suspect but did not identify himself as a law-enforcement officer.  The deputy sheriff who fired his weapon believed that he was firing at an armed suspect.

1

Nehemiah Pickens, a Harris County Reserve Deputy Constable, was shot and killed by Harris County Deputy Sheriff Wallace Jones shortly after midnight on July 5, 2006. The plaintiffs—the estate of Nehemiah Pickens and his family, Michelle, Nehemeshia, and Rayveonia Pickens—have sued Harris County and Jones in his official capacity. Municipal liability is the only basis for recovery. Defendants have filed a motion for summary judgment, (Docket Entry No. 65), to which plaintiffs have responded, (Docket Entry No. 76), and the defendants have replied, (Docket Entry No. 78). After an oral hearing at which counsel presented argument on the summary-judgment motion, the plaintiffs and defendants filed supplemental briefs. (Docket Entry Nos. 84, 85). The parties have filed extensive summary-judgment evidence and both sides have filed objections. (Docket Entry Nos. 78, 80).

Based on the pleadings, the parties' submissions, the arguments of counsel, and the applicable law, this court grants the defendants' motion for summary judgment. As a matter of law, there is no basis to hold Harris County liable for Pickens's death. The reasons for this ruling are set out below.

I.      **Background**

A.      **The Summary Judgment Evidence**

The summary judgment evidence includes the depositions and statements of the three

deputy sheriffs, Wallace Jones,[1] Jimmie Cook,[2] and Andres Blanco,[3] who were involved in Pickens's shooting.  The parties also submitted depositions taken under Rule 30(b)(6) of the Federal Rules of Civil Procedure of the Harris County Constable for Precinct 6[4] and the Harris County Sheriff's Department.[5]  The record also includes documents showing the policies of the Harris County Constable for Precinct 6 and the Harris County Sheriff's Department relating to off-duty officers wearing uniforms and carrying guns.  The parties submitted documents showing the training and instruction on the use of deadly force given to law enforcement officers, including reserve deputy constables in Precinct 6,[6] deputy sheriffs in the Harris County Sheriff's Department,[7] and commissioned law-enforcement officers under the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE).[8]  Deputy Michael Faas, who is with the Sheriff's Department, also testified as to the training provided by the Harris County Sheriff's Department.[9]  Both sides presented

---

[1]Docket Entry No. 56, Ex. A; Docket Entry No. 76, Ex. A, D; Docket Entry No. 78, Ex. C.  The personnel records of Wallace Jones are also included.  Docket Entry No. 56, Ex. J.

[2]Docket Entry No. 56, Ex. B; Docket Entry No. 76, Ex. C, F; Docket Entry No. 78, Ex. D.

[3]Docket Entry No. 56, Ex. C; Docket Entry No. 76, Ex. B, E; Docket Entry No. 78, Ex. E.

[4]Deposition of Captain Tyrone Berry, Docket Entry No. 56, Ex. E; Docket Entry No. 76, Ex. P; Docket Entry No. 78, Ex. G.

[5]Deposition of Chief Deputy David Billingsly, Docket Entry No. 56, Ex. D; Docket Entry No. 76, Ex. Q; Docket Entry No. 78, Ex. F.

[6]Harris County Constable Precinct 6 Instructional Guidelines, Docket Entry No. 56, Ex. F.

[7]Excerpts from the Harris County Sheriff's Office Department Manual, Docket Entry No. 65, Ex. L.

[8]Docket Entry No. 56, Ex. K.

[9]Docket Entry No. 78, Ex. H.

expert witnesses on training officers about the risk of misidentifying plainclothes officers and how to avoid "friendly-fire" situations. The plaintiffs presented a report by Dr. Troy Walden, a TCLEOSE instructor.[10] The defendants submitted a report by Dr. William Lewinski, a behavioral scientist specializing in law enforcement.[11]

Witnesses to the shooting and others present during some of the events, including James Hubbard, III, Lakesha Manley, Charles Thompson, and Justin Deshawn Doyle, gave statements and depositions. These are also part of the record.[12] The parties also submitted medical evidence relating to whether Pickens was running away from the deputies when he was shot, as the plaintiffs contend, or turning toward Deputy Jones, as the defendants

---

[10]Docket Entry No. 76, Ex. R. The defendants object to Walden's report on the ground that he lacks personal knowledge and failed to disclose the documents he reviewed. (Docket Entry No. 78 at 15–16). These objections are not sufficient to exclude his report. FED. R. CIV. P. 26(a)(2).

The defendants objected to the plaintiffs' submission as summary-judgment evidence a report by the late James Fyfe, Ph.D., an expert in law enforcement use-of-force situations. This report is described in *Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005). The report related to the facts of a different case. Although the opinion is relevant as precedent, a report referenced in that opinion is not competent summary-judgment evidence in this case. The objection is sustained.

[11]Docket Entry No. 78, Ex. B. The plaintiffs object to Lewinski's testimony on the ground that it "creates a material fact issue in this case on the constitutional question," (Docket Entry No. 80 at 3), by raising factual disputes that cannot be resolved on summary judgment. Whether testimony creates a fact dispute is not the test for admissibility. The objection is overruled.

[12]Docket Entry No. 45, Ex. G (statement of Justin Deshawn Doyle); Docket Entry No. 76, Ex. G (statement of James Hubbard, III), Docket Entry No. 76, Ex. H (affidavit of James Hubbard, III); Docket Entry No. 76, Ex. K (affidavit of Lakesha Manley); Docket Entry No. 76, Ex. J (deposition of Charles Thompson). Harris County objects to Hubbard's affidavit on the ground that it was submitted on July 5, 2006, while the discovery deadline was June 30, 2006. The affidavit is very similar to the earlier statement. Even if was untimely, no prejudice resulted. The objection is overruled.

The plaintiffs also submitted an unsigned statement of another witness, Tony Wooten. The defendants objected because it was unsigned. The objection is sustained. *See Okeye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 515 (5th Cir. 2001) (unsigned statement "is not competent summary judgment evidence because it does not comply with the requirements of Federal Rule of Civil Procedure 56(e)"); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir.1988) (unsworn affidavit was "disregarded as summary judgment proof" because it allowed "the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods").

contend.  This evidence includes the autopsy report[13] and opinions by Paul Radelat, M.D.[14] and Joye Carter, M.D.[15]  Other summary-judgment evidence includes an excerpt of the internal Constable's Investigation Report[16] and a diagram from that report showing the site where the shooting occurred.[17]

### B.    Factual Background

Nehemiah Pickens was a Harris County Precinct 6 Reserve Deputy Constable. Pickens was fully certified as a peace officer.  He had completed the TCLEOSE-approved academy courses required for appointment as a reserve deputy constable at Precinct 6.  As a reserve deputy constable, Pickens was an unpaid volunteer.  (Docket Entry No. 76, Ex. P at 8).  He would be "on duty" as a deputy constable only after he was specifically called and assigned to a specific area or post and he had called in to advise dispatch that he was on assignment.  On the night he was shot, Pickens was not on duty.  As an off-duty law enforcement officer, however, Pickens had a duty under Texas state law to enforce the law. The pertinent Texas code section provides as follows:

> It is the duty of every peace officer to preserve the peace within
> the officer's jurisdiction.  To effect this purpose, the officer shall
> use all lawful means.
> (b) The officer shall:

---

[13]Docket Entry No. 56, Ex. H; Docket Entry No. 76, Ex. I.

[14]Docket Entry No. 76, Ex. M.

[15]Docket Entry No. 76, Ex. N.

[16]Docket Entry No. 56, Ex. I.

[17]Docket Entry No. 76, Ex. S; Docket Entry No. 78, Ex. A.

> (1) in every case authorized by provisions of this Code, interfere without a warrant to prevent or suppress crime.

TEX. CODE. CRIM. P., art. 2.13.  This duty applies to all Texas off-duty police officers.  *Id.* at n.18.  An off-duty Texas law-enforcement officer has discretion as to how to engage in crime-suppression activities.  *City of Dallas v. Half Price Books, Records, Magazines, Inc.*, 883 S.W.2d 375, 378 (Tex. App.—Dallas 1994), *remanded on other grounds*, 918 S.W.2d 559 (Tex.App.—Dallas 1996).

The policies of the Harris County Constable for Precinct 6 allowed Pickens to carry a gun when he was off-duty but did not require him to do so.  The Constable required all officers who did carry guns off-duty also to carry their badges and credentials.  On the night in question, Pickens was carrying his weapon and had a badge on a chain around his neck.  The fact that he was armed and carrying a badge complied with Precinct 6 policies.  No witness claims to have seen the badge around Pickens's neck until after the shooting.

Harris County Constable policies forbid an off-duty reserve deputy from wearing a uniform, with a possible exception for off-duty officers who were specifically authorized to do so.  In addition, Texas law forbids a private security guard from wearing an official police uniform.[18]  Before July 2005, the Texas Department of Public Safety (DPS) had an

---

[18]In Texas, security services are regulated by the Texas Commission on Private Security, which issues licenses for and oversees those services. A "license" is "a permit issued by the commission that entitles a person to operate as a security services contractor or investigations company." TEX. OCC. CODE ANN. § 1702.002(12) (Vernon Supp. 2005).  Section 1702.108 of the Texas Occupations Code defines the scope of employment requiring a license as a security service:

> A person acts as a guard company for the purposes of this chapter if the person employs an individual described by Section 1702.323(d) or engages in the business of or undertakes to provide a private watchman, guard, or

administrative rule addressing whether reserve deputies like Pickens could wear uniforms while working extra jobs as security guards.  The administrative rule provided that a reserve law-enforcement officer working as a security guard could receive permission to wear a uniform after following DPS licensing and approval procedures and obtaining permission from the law-enforcement agency.[19]   The DPS repealed this rule on October 17, 2005,

---

street patrol service on a contractual basis for another person to:
(1) prevent entry, larceny, vandalism, abuse, fire, or trespass on private property;
(2) prevent, observe, or detect unauthorized activity on private property;
(3) control, regulate, or direct the movement of the public, whether by vehicle or otherwise, only to the extent and for the time directly and specifically required to ensure the protection of property;
(4) protect an individual from bodily harm including through the use of a personal protection officer; or
(5) perform a function similar to a function listed in this section.

TEX. OCC. CODE ANN. § 1702.108 (Vernon 2004).  Private security officers cannot wear police markings:

(a) A license holder, or an officer, director, partner, manager, or employee of a license holder, may not:
(1) use a title, an insignia, or an identification card, wear a uniform, or make a statement with the intent to give an impression that the person is connected with the federal government, a state government, or a political subdivision of a state government; or
(2) use a title, an insignia, or an identification card or wear a uniform containing the designation "police."
(b) Subsection (a) does not prohibit a commissioned security officer employed by a political subdivision of this state from using a title, insignia, or identification card, wearing a uniform, or making a statement indicating the employment of that individual by a political subdivision.

TEX. OCC. CODE ANN. § 1702.130 (Vernon 2004).

[19](e) A reserve law enforcement officer who has made application for or who has been issued a registration as a non-commissioned security officer or has been issued a security officer commission by the Texas Private Security Board under a licensed security services contractor or a letter of authority may wear the official uniform of that agency while working private security only when:

(1) the chief administrator of the appointing law enforcement agency has the authority to appoint reserve peace officers and a reserve peace officer license has been issued by the Texas Commission on Law Enforcement

because it had created confusion.  30 TEX. REG. 6773 (2005).[20]  The Texas Attorney General

interpreted this change to mean that "[a] reserve peace officer who is employed by a sheriff,

constable, a navigation district, or a municipal police department may not wear his official

uniform and display the insignia of an official law enforcement agency while working as a

private security officer licensed by the Texas Private Security Board."  Op. Tex. Att'y. Gen.

No. GA-0435 (2006); TEX. OCC. CODE § 1702.130, n.1 (2006).  The Attorney General

suggested that this interpretation correctly reads the underlying Texas statute, even without

the change in the administrative rules.  *Id.*   Under the Attorney General interpretation, a

---

Officer Standards and Education;

(2) the reserve law enforcement officer has written permission to wear the
official uniform of the appointing law enforcement agency;

(3) the written authorization must be signed and dated by the chief
administrator of the appointing law enforcement agency and shall be
maintained for inspection by the Texas Private Security Board at the
principal place of business or branch office of the licensed security service
contractor or letter of authority;

(4) the reserve peace officer is wearing the official uniform of the
appointing agency that clearly identifies that agency and is not wearing a
generic peace officer uniform;

(5) the reserve peace officer meets the definition of the Internal Revenue
Service as an employee of the licensed security service contractor or letter
of authority;

(6) the licensed security services contractor or letter of authority has not
accepted any monies or remuneration to allow the reserve peace officer to
work under the license of the security services contractor or letter of
authority;

(7) the reserve peace officer has not terminated employment with the
appointing agency; and

(8) the reserve peace officer has not been summar[il]y suspended or
summar[il]y denied or revoked by the Texas Private Security Board.

29 TEX. REG. 9686 (2004), repealed by 30 TEX. REG. 6772-73 (2005).

[20]The Texas Local Government Code was also later clarified to state that a Texas reserve officer,
unlike a fully commissioned officer, is required to obtain a  license to work as a security guard.  The law now
explicitly notes that a reserve peace officer "is not exempt from Chapter 1702, Occupations Code," the
licensing requirement for security services.  TEXAS LOC. GOV'T CODE ANN. § 341.012(h)(2) (2006).

reserve deputy could never wear a police uniform or any police markings while working as a security guard.  Under the DPS rules, Pickens could have worn his uniform if he had obtained DPS licensing and approval and the Constable's approval and filed the requisite paperwork.  Pickens did not do this, according to the Harris County Constable.  Under either interpretation, Pickens was barred from wearing his uniform or any police marking while working as a security guard.

Pickens regularly worked as a security guard at the Drysdale apartment complex. (Docket Entry No. 76, Ex. G at 2).  Pickens did not have permission from the Constable to work this extra security job.  (Docket Entry No. 65 at 9–10; Docket Entry No. 76, Ex. P at 8, 90–91).  According to the Constable, under state law a reserve deputy could not "work extra jobs at all."  (*Id.*).  According to the written Precinct 6 policies, Pickens could not "work in the capacity of a Peace Officer while off duty."  (Docket Entry No. 65, Ex. F at 3). As noted, under state law, Pickens was forbidden to wear an official uniform or insignia while working a private security job because he was a reserve officer.

On the night of the shooting, Pickens was at the apartment complex, wearing a bulletproof vest and carrying a gun and handcuffs.  The plaintiffs do not dispute the evidence showing that Pickens was at the apartment complex working as a security guard when he was shot.  (Docket Entry No. 33, 76).

At around midnight on July 6, 2005, Harris County Sheriff's Department Deputies Wallace Jones, Andres Blanco, and Jimmie Cook were working in a squad called the "Hot Spot Unit" near the Drysdale apartment complex.  The three deputies were in separate one-

9

man patrol cars, using radio communication. (Docket Entry No. 65, Ex. C at 22–23). The Hot Spot Unit does not respond to calls but patrols in areas known for narcotics trafficking and other crimes. (Docket Entry No. 65, Ex. C at 18–19). All three deputies were experienced law-enforcement officers. Deputy Blanco was hired by the Harris County Sheriff's Department in April 1995 and received his peace officer license in 1997. (Docket Entry No. 65, Ex. C at 9–12). Deputy Cook started patrolling as a peace officer for the Sheriff's Department in 1995. (Docket Entry No. 65, Ex. B at 65). Deputy Jones has been a licensed police officer for the Sheriff's Department since 1990. (Docket Entry No. 65, Ex. A at 18). Both Jones and Pickens are African-American. (Docket Entry No. 65, Ex. J at 1; Docket Entry No. 76, Ex. I at 2).

Shortly after midnight, Jones saw a driver commit a traffic violation. Jones attempted a traffic stop, but the car sped away. (Docket Entry No. 65, Ex. A at 34–36). Jones gave chase, and Blanco and Cook followed. (Docket Entry No. 65, Ex. B at 47–48; Ex. C. at 25–28). After a short chase, the driver jumped out of his car near some garbage dumpsters on the Drysdale apartment complex property and ran through the fence. (Docket Entry No. 65, Ex. A at 35–38; Ex. B at 52–53; Ex. C at 30–31). Jones saw the suspect jump out of the car. The suspect was wearing light clothing, but Jones could not see exactly what he was wearing. (Docket Entry No. 65, Ex. A at 39–41). Because the windows of the suspect's car were tinted, Jones did not know how many people had been in the car. (*Id*. at 42–43).

Jones stopped his patrol car so close to a garbage dumpster that he could not easily open the door. (*Id*. at 48). Jones lost sight of the suspect trying to get out of the car. When

10

Jones was able to get out of his patrol car, he saw the suspect and a second man, dressed in dark-colored clothing, on the other side of the apartment complex fence in a parking lot next to a pharmacy.  (*Id*. at 49–50).  The man who had fled from the car and the second man were running parallel to each other.  (*Id*. at 50–51).  Jones recognized the first man from the light-colored clothing he was wearing.  Jones believed that the second man was also a suspect, associated with the man who had fled the car.  (*Id*. at 53–54).  It did not appear to Jones that the second man was chasing the man in light-colored clothing because they were running parallel to each other.  (*Id*. at 56).  The second man was later identified as Pickens.

Jones gave chase.  Jones was behind the second man; the other deputies were behind the first suspect.  Jones had not been carrying his gun because he saw no indication that the first suspect was armed.  As he gained on the second man in dark clothing, Jones saw that the man was carrying a gun in his hand.  (*Id*. at 65).  Jones and the other deputies assert  that Jones yelled, "He's got a gun.  He's got a gun," loud enough that the other officers could hear, and then Jones yelled a second time, "Drop the gun.  Drop the gun."  (*Id*.; Docket Entry No. 65, Ex. B at 76; Ex. C at 36).  The civilian witnesses dispute this testimony and assert that Jones did not yell any instruction to put down the gun.  (Docket Entry No. 76, Ex. G at 3; Ex. J at 4; Ex. K at 2).

Jones testified that the second man continued running away from him and did not drop his gun.  (Docket Entry No. 65, Ex. A at 66).  Jones saw the man in dark clothing slow down and begin to turn his body.  Jones stopped running and yelled again, "Drop the gun.  Drop the gun."  (*Id*. at 66–67).  Jones testified that he saw the second man turn to his left and begin

11

to point his gun at Jones.  (*Id*. at 67–68).   When he saw the barrel of the gun that the man was holding turning toward him, Jones removed his own gun from its holster and fired.  (*Id*. at 68–69).  Jones started firing from a standing position but ended firing from a kneeling position.  (*Id*. at 76–77).  Jones continued to fire until he saw the second man's gun drop. Jones emptied his gun, firing sixteen bullets.  (*Id*. at 77–78, 80).  Jones did not approach the man after he fell.  (*Id*. at 79).

Blanco was immediately behind Jones during the automobile chase.  (Docket Entry No. 65, Ex. C at 29).   When Blanco stopped his car, he saw the original suspect running about five or six feet away.  (*Id*. at 31–32).  Blanco described the original suspect as a African-American male, 5'8" or 5'9" tall,  of medium build, wearing yellow and tan pants. (*Id*.).  Blanco followed this suspect through an opening in the fence into the pharmacy parking lot.  (*Id*.).  Blanco then saw another individual—Pickens—running in the same parking lot in the same direction as the suspect.  (*Id*.).  The second individual, according to Blanco, was a medium-built African-American male wearing a black shirt.  (*Id*. at 34).  Jones was pursuing this second individual as Blanco and Cook ran behind the first suspect.  Jones did not pass Blanco in the pursuit.  (*Id*. at 33).  Blanco heard Jones yell several times, "Drop the gun.  He's got a gun."  (*Id*. at 36).  Blanco took cover behind a concrete pillar.  (*Id*.). Blanco could not see Jones but heard him to Blanco's right.  (*Id*. at 37).  When Blanco heard gunshots, he looked away from the pillar and saw the man in dark clothing fall to the ground. (*Id*. at 40).   Blanco saw Pickens before he fell.  Blanco testified that Pickens had his back toward Jones, but was turned at an angle.  (*Id*. at 50, 73).  Blanco did not see Pickens face

12

Jones.  (*Id*.).  Blanco saw Jones down on one knee and heard more than five shots.  (*Id*. at 48–49).  Pickens fell, landing on his right side.  (*Id*. at 51).

During the car chase, Cook was in the third car behind Blanco.  (Docket Entry No. 65, Ex. B at 48).  When the car chase ended, Cook saw a man get out of the car the officers had been following.  Cook directed his spotlight to the car.  (*Id*. at 52–53).  Cook described the man as having a medium build and wearing light-colored clothing.  (*Id*. at 55).  Cook got out of his patrol car and started chasing this suspect, running behind Blanco.  (*Id*. at 64).  Cook drew his taser and yelled, "Sheriff's Office.  Get on the ground.  Get on the ground.  Stop." (*Id*. at 63).  Cook then saw Jones running.  Cook started out in front of Jones, but Jones passed him and continued to run 15–20 feet to Cook's right.  (*Id*. at 64, 67).  Cook peripherally saw an additional person, wearing a black shirt, running in the same direction as the first suspect.  Cook believed this person to be a second suspect.  (*Id*. at 68).  Cook, out of breath from running, did not yell any warnings about the taser or a gun after the second person entered his peripheral vision.  (*Id*. at 73).  Jones was approximately 15 feet ahead when Cook heard Jones yell loudly, "He's got a gun.  Drop the gun.  Drop the gun.  Drop the gun."  After a pause and a "little distance," Cook heard shots.  (*Id*. at 76).  Cook did not see Jones draw his weapon.  Cook turned to look at Jones after hearing shots.  (*Id*. at 77).

At that time, Cook saw the second suspect—Pickens—pointing a silver semiautomatic pistol at Jones.  Cook did not see Pickens point the gun at Jones until after the shooting had already started.  (*Id*. at 78 - 80).  Cook drew his own gun because he thought Pickens was a threat to Jones and the other officers, but Cook did not fire.  (*Id*. at 84).  Cook testified that

13

as Pickens was shot, he was "either trying to run or trying to engage." (*Id*. at 88).  According to Cook, Jones initially fired his gun while standing, then crouched down on one knee and continued to fire.  (*Id*. at 88–89).  Cook stated that when Pickens was hit, his gun flew out of his hand and he fell to the ground.  (*Id*. at 90).  Jones continued to fire when Pickens was on the ground, but it appeared that many of Jones's shots hit the ground.  (*Id*. at 92).  Pickens fell on his back.  (*Id*.).  Cook approached the fallen man and saw his deputy constable badge on a chain around his neck.  Cook yelled at Blanco to call an ambulance.  (*Id*. at 93).

The original suspect, Justin Doyle, stated that he fled from the police because he did not have a driver's license and had thrown a cigar laced with marijuana out of the car window.  (Docket Entry No. 65 at 2).  Doyle planned to run through the gate at the Drysdale apartment complex to flee the police.  Doyle noticed a black man in dark clothing at the apartment complex, but that man did not say anything, and Doyle did not know whether he was part of the chase.  (*Id*.).  As Doyle was running south, he heard someone scream, "Drop the gun!" and repeat the command fifteen seconds later.  (*Id*.)  Doyle heard more yelling a few seconds later.  After three shouted commands that Doyle could not make out, he heard gunshots and started running faster.  (*Id*.).  Doyle was not caught in the pursuit.  He turned himself into the police later.  (*Id*. at 3).

Several witnesses also testified.  James Hubbard, III gave two statements about the shooting.  (Docket Entry No. 76, Exs. G, H).  Hubbard was visiting one of the apartments at the Drysdale complex.  Hubbard knew Pickens from seeing him around the complex. (Docket Entry No. 76, Ex. G at 2).  Hubbard was watching television at 1:45 or 2:00 a.m. on July 6

when he heard sirens and noise and went out on the second-floor patio to see what was happening. (*Id*. at 1–2).  Hubbard saw a Buick being chased by police cars.  Hubbard saw the driver jump out of the Buick while it was still moving, near the apartment complex's dumpsters. (*Id*.).  Hubbard testified that a second man, whom he recognized as Pickens, blocked the suspect's path into a wooded area.  The suspect instead fled through an opening in the complex fence into a parking lot.  (*Id*.).  Hubbard saw Pickens run after the suspect, following him into the parking lot.  Hubbard saw four deputies running after the suspect and Pickens.  (*Id*.).  Hubbard testified that he saw one of the deputies drop to his right knee, pull out a weapon, aim, and fire at Pickens.  (*Id.* at 3).  Hubbard saw Pickens's body jolt.  The deputy quickly fired many more shots.  (*Id*.).

In both statements, Hubbard stated that Pickens was running in the direction of the suspect and was shot in the back while running away from the deputies.  (Docket Entry No. 76, Ex. G at 3; Ex. H at 2).  Pickens did not turn around in the direction of the deputies during the pursuit.  (*Id*.).  Hubbard did not see Pickens draw a weapon before the shots were fired. (Docket Entry No. 76, Ex. G at 3.).  Hubbard heard no warning shouts before the deputy fired his gun.  (*Id*.).  Hubbard testified that Pickens was wearing a dark shirt marked "POLICE" and that he had a holstered weapon and handcuffs showing on his belt.  (*Id*.).

Another witness, Lakesha Manley, lived in the apartment complex.  She testified that from her second-floor patio, she saw Pickens shot in the back while he was running.  (Docket Entry No. 76, Ex. K at 2).  She did not hear any warnings or see Pickens raise his gun before the shooting began.  (*Id*.)

15

Another witness, Edward Thompson, was in the alley when the shooting occurred. (Docket Entry No. 76, Ex. J at 7).  Thompson knew Pickens from his work as a security guard at the apartment complex.  (*Id*. at 8).  Thompson testified that the officers did not say anything before shooting Pickens.  (*Id*. at 4).  Thompson testified that 72 shots were fired at Pickens—it is otherwise undisputed that Jones fired 16 shots—and that all the deputies "took their turn in firing on him"—it is otherwise undisputed that no deputy but Jones fired.  (*Id*. at 6).  Thompson testified that Pickens had his gun by his side and did not raise it.  (*Id*. at 7). Like Hubbard, Thompson testified that Pickens was wearing a black shirt with "POLICE" written on the back.  Thompson testified the lettering was very clear, even in "pitch black." (*Id*. at 8).

Although Thompson and Hubbard stated that Pickens was wearing a t-shirt that had the word "POLICE" written on it, no other witnesses testified that Pickens was wearing any visible police identification.  The defendants assert, and the plaintiffs do not dispute, that the autopsy and scene photographs show that Pickens was wearing a plain navy t-shirt.  (Docket Entry No. 65, Ex. H; Docket Entry No. 76, Ex. I).

The medical examiner determined Pickens's time of death to be 12:15 a.m. on June 6, 2005.  (Docket Entry No. 76, Ex. I at 19).  Picken's gun was found approximately two feet from his body, to the left.  Sixteen .40 caliber casings were found ten feet from Picken's body.  (*Id*. at 22).  The autopsy results showed no alcohol or drugs in Pickens's blood.  (*Id*. at 18).  The autopsy report stated that Pickens was wearing a navy t-shirt over a white t-shirt and a bulletproof vest.  (*Id*. at 1).  The autopsy documented the trajectory of three wounds

as "back to front," one bullet to the head, and two to the body. (*Id*. at 2–5). The report described the injury to Pickens's right leg as "right to left and slightly back to front." (*Id*. at 5). The autopsy found Pickens's cause of death to be homicide by multiple gunshot wounds. (*Id*. at 1).

The plaintiffs assert that Pickens was shot in the back, as he was running in the same direction as the uniformed deputies, with no warning. The defendants assert that Pickens was shot because he ignored repeated shouts to stop and put down the gun, slowed, and began to turn facing Jones, with his gun raised, and failed to identify himself as a police officer.

The plaintiffs submitted medical opinions by Dr. Paul Radelat and Dr. Joye Carter. Dr. Radelat examined Pickens's body and concluded that the head wound was instantly fatal. (Docket Entry No. 76, Ex. M at 1). Dr. Radelat confirmed the autopsy's findings about the trajectory of the bullet wounds. (*Id*. at 1–2). Dr. Radelat concluded that all the shots that hit Pickens had been fired from behind Pickens. (*Id*. at 2). Dr. Carter examined the autopsy documents and determined that the shots were fired at Pickens's back and that Pickens never faced his shooter. (Docket Entry No. 76, Ex. N at 2). Dr. Carter found that the bullet trajectory to Pickens's thigh "would not have been achievable" if Pickens had been standing still and that he must have been running or moving away from the shooter when the bullet hit his thigh. (*Id*.).

The defense expert witness, Dr. William Lewinski, testified that it would have taken from 5.5 to 7 seconds between when Jones drew his gun and when he stopped firing. Lewinski testified that Jones would had taken from 4 to 5 seconds to fire. (Docket Entry No.

17

78, Ex. B at 5).  Jones testified that he thought it took him between 6 and 9 seconds to fire.
(*Id.*, Ex. A at 110).  According to Dr. Lewinski, it would have been impossible for Jones to
know Pickens's exact location and position because of the stress produced by the dangerous
situation.  (*Id.*, Ex. B at 5).  Pickens could have changed positions several times during those
seconds, making the scene appear different to various onlookers.  (*Id.* at 5–6).

The plaintiffs assert that the disputed facts preclude summary judgment as to whether
the shooting was unconstitutionally excessive force.  The plaintiffs allege that Harris County
and Jones in his official capacity may be held liable for the shooting because Harris County:
(1) required off-duty deputies like Pickens to involve themselves if they saw a need to
prevent a possible felony, such as a suspect avoiding arrest; (2) allowed them to carry a gun
and use it in crime-suppression efforts, but prevented them from wearing a police uniform;
and (3) failed to train Pickens and/or Jones in avoiding misidentification of off-duty officers
as suspects, resulting in "friendly-fire" shootings.  The plaintiffs allege that the first two
policies created a known risk that on-duty officers would misidentify an off-duty officer who
was not in uniform but was assisting in crime suppression, creating a need for particularized
training in avoiding this risk.  The plaintiffs acknowledge that Pickens did not identify
himself as a police officer when he intervened in the chase on the night of July 6, 2005, but
allege that Harris County is liable for the shooting that resulted because it did not adequately
train Pickens or Jones in how to avoid friendly-fire situations.

Both sides presented evidence as to the training Pickens and Jones would have
received and expert testimony as to the need for additional training.  Captain Berry of the

18

Constable's Office testified about Pickens's training.  Berry testified that Pickens's TCLEOSE training would have included "on-duty and off-duty issues." (Docket Entry No. 76, Ex. P at 40–41).  "They show you live footage of, you know, situations where off-duty officers have probably been mistaken for a suspect, and they talk you through what you should and should not do." (*Id*. at 41).  Neither TCLEOSE nor the Harris County Constable provided Pickens particularized training on off-duty intervention, including identifying himself as an off-duty officer.  (*Id*. at 84).  Berry acknowledged that the Constable's field training lacked a component "particularized to how you operate when you're in plain clothes off duty." (*Id*. at 99).  According to Berry, the Constable had requested the Harris County Commissioner's Court to fund a dedicated training officer, but funding was not recieved. (*Id*. at 84).  Such an officer could have provided additional training on "armed encounters, you know, off-duty situations, just a host of other things." (*Id*. at 88).

Chief Deputy Billingsly testified on behalf of the Harris County Sheriff's Department about Jones's training.  (Docket Entry No. 76, Ex. Q).  The Sheriff's Department did provide some training about encounters with plainclothes officers, but Billingsly was not aware of specific training materials.  (*Id*. at 23, 25).  The Sheriff's Department trained deputies to identify themselves to on-duty police officers when off-duty.  (*Id*. at 40).  Sheriff's Department deputies would have been expected to be armed at all times, to have their identification and badges with them, and to identify themselves to on-duty officers.  (*Id*. at 42).  The same procedures would apply to undercover or plainclothes on-duty officers.  (*Id*.)  Jones was trained to focus on threats while on duty; if a "guy in plain clothes is displaying

19

a gun" and does not identify himself as a fellow police officer, Jones was trained to pull his own weapon to protect himself.  (*Id*. at 37).  Jones was trained that if a plainclothes person "had the gun manifest showing and if the officer deems that that display of the weapon is in any way provocative toward him or her, the officer is justified to use deadly force against them."  (*Id*.).  Jones had no particularized training about "off-duty police officers engaging in crime suppression activities while in plain clothes" but did have the training described above about encountering on-duty police officers.  (*Id*. at 47–48).

According to the plaintiffs' expert, Dr. Troy Walden, the state TCLEOSE training addressed plainclothes operations, but not as a specific or particularized training objective.  (Docket Entry No. 76, Ex. R at 2).  TCLEOSE does not provide specific training in off-duty officers engaging in law-enforcement.  (*Id*.).  According to Walden, "the prevailing practice among law-enforcement agencies in the state of Texas is to provide particularized training regarding the risks and/or dangers relating to off-duty law enforcement encounters,"  (*Id*. at 3), but Harris County did not provide such particularized training to either deputy constables or deputy sheriffs.

The defendants argue that an off-duty officer who involves himself in a police encounter knows to identify himself immediately as a police officer to the uniformed, on-duty officers and follow their instructions.  The defendants argue that the need for such steps is simply common sense and that training changes would have not have averted this tragedy.  (Docket Entry No. 65 at 18; Docket Entry No. 78 at 18).

The plaintiffs offer several theories to support the imposition of municipal liability.

They are:  unconstitutional policies requiring off-duty officers to be "always on" and allowing them to use guns, yet forbidding them from wearing uniforms; the failure to train to avoid the risk of misidentification; the denial of due process; state-created danger; and ratification. (Docket Entry No. 76 at 22).  These theories and the defendants' summary-judgment arguments are examined below.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Rule 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing

21

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence."  *Boudreaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Boudreaux,* 402 F.3d at 5400.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

### B.       Section 1983 Municipal Liability

The plaintiffs sue Harris County and Jones in his official capacity.  A suit against Jones in his official capacity under section 1983 is the same as a suit against Harris County. *See Woodward v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690 n. 55 (1978)).  Municipal liability is the issue in this case.

Municipal liability requires proof of an underlying claim of a violation of rights and three other elements: "a policymaker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005).  An "official policy" is either a policy statement, ordinance, or regulation,  that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy.  *Id.; Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).  The policymaker must have either actual or constructive knowledge of the alleged policy or custom.  *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) ("Actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.1984).

"It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability."  *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (citing

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  When, as here, the plaintiffs rely on a failure-to-train liability theory, they  must show a causal link between the failure to train and the constitutional violation and that the failure to train amounts to deliberate indifference. *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005); *City of Canton*, 489 U.S. 378.  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. at 410.  "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Estate of Davis*, 406 F.3d at 381 (citations omitted).  Deliberate indifference requires a showing of more than negligence or even gross negligence.  "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'"  *Id.* (quoting *Thompson v. Upshur Co.*, 245 F.3d 447, 459 (5th Cir.2001)).  "[I]t may happen that in light of  the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a municipality might reasonably be found to be deliberately indifferent.  *City of Canton*, 489 U.S. at 390; *see also Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998).

A single incident is usually insufficient to demonstrate deliberate indifference.  *See, e.g.,  Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002); *Thompson*,

24

245 F.3d at 459; *Snyder*, 142 F.3d at 798 ("proof of a single violent incident ordinarily is insufficient" for liability; the "plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured.'"); *Cousin v. Small*, 325 F.3d at 637 (5th Cir. 2003) ("[t]o succeed on his claim of failure to train or supervise" the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to "demonstrate a pattern of violations"); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (proof of deliberate indifference "generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights'" (*quoting Thompson*, 245 F.3d at 459)).  Deliberate indifference requires that the plaintiffs "show that the failure to train reflects a 'deliberate' or 'conscious' choice to endanger constitutional rights." *Id*. at 799 (citing *City of Canton*, 489 U.S. at 389).  Notice of a pattern of similar violations is generally required.  *See Roberts*, 397 F.3d at 294 (rejecting plaintiffs' proffered pattern where it required "an excessively high level of generality");  *see also Burge*, 336 F.3d at 371 (evidence "not sufficient to establish deliberate indifference or knowledge" that a constitutional violation "would be a highly likely consequence"); *cf. Bryan County*, 520 U.S. at 412 (holding that a finding of supervisory liability for inadequate screening "must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff").  While the specificity required should not be exaggerated, the cases require that the prior acts be fairly similar to what ultimately transpired.  *See, e.g., Snyder*, 142 F.3d at 798 ("[P]laintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured." (internal quotation marks and citation omitted)).

The Fifth Circuit has characterized the "single incident exception" to the general rule requiring a pattern of violations as inherently "a narrow one, and one that we have been reluctant to expand." *Burge*, 336 F.3d at 373 (*citing Pineda*, 291 F.3d at 334-35); *see also Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir.2000) ("We have consistently rejected application of the single incident exception and have noted that 'proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.' " (quoting *Snyder v. Trepagnier*, 142 F.3d at 798)); *Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000). "To rely on this exception, a plaintiff must prove that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Robert*s, 397 F.3d at 295 (quoting *Brown*, 219 F.3d at 461). The Fifth Circuit found a single incident to suffice in *Brown v. Bryan County* because the county "failed to provide any training or supervision for a young, inexperienced officer with a record of recklessness." The court noted that "there is a difference between a complete failure to train, as in [*Brown v. Bryan County*], and a failure to train in one limited area." 219 F.3d at 462, *quoting Cozzo*, 279 F.3d at 288 (internal quotation marks and citations omitted); *see also Roberts*, 397 F.3d at 295-96 (distinguishing *Brown v. Bryan County*).

The threshold issue is whether there is an underlying constitutional violation.

## III.   The Underlying Constitutional Violation

"[I]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833,

833, 841 at n.5 (1998) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  The plaintiffs argue that Jones's conduct violated Pickens's constitutional rights.  "In order to succeed on a § 1983 claim that the defendants violated his Fourth Amendment right against excessive force, a plaintiff must show that he was seized and that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).  "[A] particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396).  "Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Id.* (citing *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir.2003)).  The proper application of the objective reasonableness standard requires careful attention to the facts and circumstances of each particular case, including whether the suspect poses an immediate threat to the safety of the officers or others.  "[A]n officer who determines that deadly force is necessary to protect himself or others should give a warning if it is 'feasible.'" *Colston v. Barnhard*, 130 F.3d 96 (5th Cir. 1997) (citing *Tennessee v. Garner*, 471 U.S. 1, 10 (1985)).

The parties offer sharply contrasting accounts of the incident.  The plaintiffs emphasize that neither of the other two deputies present at the scene saw Pickens point his weapon toward Jones before Jones began to fire and that all but one civilian witnesses heard no shouted warning to Pickens before the shooting.  (Docket Entry No. 76, Ex. G; Ex. J; Ex.

K).  The plaintiffs point to the medical evidence showing that Pickens was shot in the back while in motion,  (Docket Entry No. 76, Exs. I, N, M).  The defendants emphasize evidence that Pickens failed to identify himself as a police officer; failed to respond to repeated commands to put down his weapon; appeared to be turning to face Jones; and that Jones faced a split-second decision in a volatile situation in which an armed man was believed to present an immediate threat of serious bodily harm or death to the deputies.  (Docket Entry No. 65, 78; Docket Entry No. 76, Ex. A).  Although the plaintiffs label the act as "murder," the plaintiffs do not dispute that the shooting resulted from a mistake.  Jones shot Pickens because he mistakenly believed that Pickens was an armed suspect instead of armed off-duty police officer attempting to assist the deputies in catching another suspect.  The issue is whether Jones's mistake and his use of deadly force were objectively reasonable.  *See, e.g.*, *Colston*, 130 F.3d 96.

In most friendly-fire cases, "courts allow a jury to decide whether the shooting officer's actions were objectively reasonable."  *Ngo v. Stoolie*, Civ. No. 03-3376, 2006 WL 1579873, at *7 (D. Minn. June 2, 2006) (collecting cases).  In most cases, however, there are disputed fact issues as to whether the shooting officer was reasonable in mistaking the nonuniformed officer for a suspect.  *Id.*; *Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003); *Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 1998).  In the present case, by contrast, the record would not permit a jury to conclude that Jones was objectively unreasonable in mistaking Pickens for an armed suspect.

It is undisputed that Pickens made no effort to identify himself as a police officer

28

when he joined the on-duty deputies in chasing a suspect, carrying a gun.  The plaintiffs do not dispute the defendants' assertion that Pickens was not wearing a uniform or other clothing that identified him as a law-enforcement officer.  Although two witnesses described Pickens as wearing a shirt with "POLICE" written on it, the defendants denied that he was wearing any such shirt and assert that the autopsy records show that Pickens was wearing a plain navy t-shirt with no lettering.  The plaintiffs do not dispute that Pickens was wearing a plain t-shirt, consistent with the "no uniform" policy.  The record in this case contrasts with other friendly-fire cases in which the shooting officer had information available showing that the victim was a police officer.  *See, e.g., Young v. City of Providence,* 404 F.3d 4 (1st Cir. 2005) (off-duty officer was yelling "police, police," or "police, get out of the way," and "freeze" and witnesses understood that he was a police officer by his verbal commands and behavior); *Wilkins*, 350 F.3d at 955 (dispute as to whether it was reasonable for the shooting officers not to understand that the person they were shooting was another police officer); *Jensen*, 145 F.3d 1078 (dispute as to whether the shooter's failure to recognize that the figure he was shooting was a fellow officer); *Ngo*, 2006 WL 1579873 (dispatcher gave information that a plainclothes officer was on the scene, and the plainclothes officer was wearing a vest with "police" written on it in reflective letters, flagged down the police car, and one of the two officers did not shoot because he realized the man was police officer created disputes as to whether the other officer's failure to realize that he was shooting an officer was reasonable).  In this case, the record showed no information available to Jones or the other officers that Pickens was a fellow officer.  The record in this case makes it clear that Jones's

29

failure to recognize that Pickens was a fellow officer was objectively reasonable.

The evidence in this case does sharply conflict in ways material to determining whether Jones was objectively reasonable in believing that Pickens posed an imminent threat of death or bodily injury to Jones or other deputies at the scene.  There are disputes as to whether Jones warned Pickens to drop the gun before beginning to shoot and whether Pickens was running away from Jones or turning toward Jones when the firing began.  These factual disputes make it difficult to find that, as a matter of law, Jones's use of excessive force against Pickens was objectively reasonable.  Although police officers cannot delay a decision that must be made in a stressful, fast-moving situation, there are disputed fact issues material to determining whether Jones acted reasonably when he fired sixteen shots from behind Pickens.  For the purpose of examining municipal liability, this court assumes that a reasonable jury could find that Jones used excessive force by shooting Pickens on July 6, 2005.

## IV.   The Unconstitutional Policy or Custom and the Failure-to-Train Claims

The plaintiffs challenge two state laws: one requiring off-duty officers to aid in law enforcement and one forbidding off-duty reserve officers from wearing their uniforms on security jobs.  The plaintiffs' argument is that the policy requiring off-duty officers to be "always on duty" and the Constable policy allowing off-duty reserve deputies discretion to carry a gun, combined with the policy of prohibiting off-duty officers from wearing uniforms, required Harris County to have protocols and give training to avoid misidentification of off-duty officers.  The plaintiffs argue that Harris County's policy of

30

inadequate protocol and training caused the constitutional injury.

The plaintiffs argue that Pickens's training was deficient in off-duty weapon use, self-identification, and intervening in crime-suppression while off-duty. (Docket Entry No. 76 at 26–33).  The plaintiffs argue Harris County lacked particularized training to "ensure proper actions and responses are undertaken by law enforcement personnel while off-duty." (Docket Entry No. 76 at 25–26, 39–40).  The plaintiffs claim that "Pickens appeared woefully untrained and that is what caused his death."  (Docket Entry No. 76 at 24).  The defendants claim that common sense rather than specified training would have prevented the injury, as "any reasonable adult knows that you place yourself at high risk if you have a gun in your hand in the presence of uniformed police officers."  (Docket Entry No. 78 at 21).

The plaintiffs rely on *Young v. City of Providence*, 404 F.3d 4 at 27 (1st Cir. 2005). In *Young*, two on-duty officers responded to a call.  A jury found that one of the officers, a rookie with eight days of experience as a police officer, used excessive force when he shot and killed an off-duty police officer.  The off-duty officer was attempting to respond to the same incident as the on-duty officers under a policy that required him to be always armed and always on duty.  The on-duty officers, who were white, mistook the African-American off-duty officer for a threat.  The district court granted summary judgment as to the municipal liability claim.  The appellate court remanded for a jury trial on the claim that the city had violated section 1983 by failing to train the on-duty shooting officer on issues relating to on-duty/off-duty interactions.  The court affirmed the district court's conclusion that "any proper allegation of failure to train must be aimed at [the shooter's] lack of training and not at the

deficiencies in [the victim's] training, and must allege that [the shooter's] lack of training caused him to take actions that were objectively unreasonable and constituted excessive force on the night he shot [the off-duty officer]." *Id.*

In *Young*, the appellate court found that the evidence could have supported a jury verdict that the excessive force was caused by inadequate training. The on-duty officer should have recognized the victim as an officer due to his demeanor and verbal commands, including yelling "police, police," or "police, get out of the way," and "freeze." The civilian witnesses on the scene recognized the victim as a police officer because of what he was saying and doing. The appellate court held that although there was no evidence of other friendly-fire shootings, the police department nonetheless knew that absent particularized training on avoiding off-duty misidentification, friendly-fire shootings were likely to occur, given the department's "always armed/always on-duty" policy. "[I]n short, that the jury could find that the department knew that a friendly fire shooting in violation of the Fourth Amendment was a predictable consequence of the [department's] failure to train on on-duty/off-duty interactions, and therefore that the department was deliberately indifferent to [the victim's] constitutional rights." 404 F.3d at 29. Finally, the appellate court found that training the shooter to know that there could be off-duty officers at a scene responding to the same incidents, whom on-duty officers must take pains to identify, would have made a difference, because there was evidence that the off-duty officer made his identity clear to the

witnesses.  *Id*.[21]

One other case addresses municipal liability for failure to train on-duty officers on the risk of misidentification in encounters with off-duty or plainclothes officers.  In *Ngo v. Storlie*, 2006 WL 1579873 (D. Minn. 2006), an officer mistook an undercover officer for a fleeing, armed suspect and shot him multiple times.  The undercover officer had been shot as he was sitting in his parked car.  That officer radioed for help and reported the assault, describing the suspect and identifying himself as a plainclothes officer.  The officer also opened his sweatshirt, revealing a bulletproof vest with the word "POLICE" written in white reflective lettering.  The defendant officers heard the dispatch but did not hear the statement that the wounded officer was operating undercover in plain clothes.  When the on-duty officers saw a wounded man kneeling on the ground beneath a streetlight, they first believed that he was the suspect they sought.  Both officers exited their vehicle and pointed their guns at the man; neither communicated with him or gave any verbal commands.  One of the uniformed officers realized that the man was a fellow police officer and did not shoot.  The other uniformed officer did not realize that the plainclothes man was an officer and did not hesitate, shooting him six times.  The district court denied summary judgment on the excessive force claim, finding that a reasonable jury could find that the uniformed officer used excessive force.  The court noted the evidence that the on-duty officer had received detailed dispatched messages about the plainclothes officer's situation yet, on arriving at the

---

[21]On remand, the district court found disputed fact questions as to whether the supervisors provided adequate training.  396 F. Supp. 2d 125, 138 (D.R.I. 2005).

scene, exited the squad car and fired a machine gun without any verbal warnings.  *Id*. at *5.
The court noted that the other officer had recognized that the man was a police officer and
refrained from shooting.  *Id*.

In *Ngo*, the district court granted summary judgment on the claim that the City of
Minneapolis had exhibited deliberate indifference in failing to train its uniformed officers in
avoiding misidentification of plainclothes officers in the field, despite the "obvious need for
specific training and protocols in this area."  *Id.* at *9.  The court noted that "[n]o court in the
Eighth Circuit has found that municipalities have a constitutional duty to train officers to
approach a shooting suspect in a manner that accommodates the possibility that the suspect
might be a police officer in plain clothes."  *Id.* at *10.  Finding *Young* distinguishable, the
*Ngo* court found that the plaintiff had not identified  "any specific training that would have
prevented [the shooter's] mistaken perception that [the plaintiff] was the suspect-at-large."
 *Id.*  The court noted that  the City of Minneapolis had some training on identifying
plainclothes officers in the field.  *Id.*  The court also noted that there was no evidence that the
City had ignored a pattern of misidentification; to the contrary, this was the first time in
Minneapolis history that one officer shot another due to mistaken identity.  *Id.* at *11.
Concluding that the plaintiff had failed to show that plainclothes officer identification
training was constitutionally required or that the City was on notice of an obvious need for
additional training, the district court granted summary judgment for the City of Minneapolis
on the failure-to-train claim.  *Id.*

*Young* specifically addresses one issue important to the present case.  The plaintiffs

34

assert that Harris County is liable for failing to train Pickens as well as for failing to train Jones in avoiding misidentification in on-duty/off-duty officer encounters.  The defendants argue that the critical issue is whether the shooter, Jones, received constitutionally deficient training.  In *Young*, the court held that the issue was not whether the off-duty officer's death was caused by his own lack of proper training in identifying himself or in otherwise conducting himself while off-duty, but instead whether the shooter's training was adequate. 404 F.3d at 27.  The court relied on *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), which establishes that a city worker has no constitutional right to adequate training.  Like the plaintiff in *Young*, the plaintiffs' allegation of constitutional violation in this case is based on the excessive force claim.  In the objective reasonableness test for excessive force, the "victim's actions are invariably considered from the officer's perspective and taken as given."  *Young*, 404 F.3d at 27; *see also Ballard*, 444 F.3d at 402 (citing *Graham*, 490 U.S. at 396).

No court has found municipal liability under a failure-to-train theory in a friendly-fire situation for failure to train the victim.  Every court required to decide a friendly-fire claim has held that the issues must be judged from the shooter's perceptive, not the victim's.  *See Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) (the issue is whether it was reasonable for the officers to understand that the person they were shooting was another police officer); *Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 2003)(a police officer has a constitutional right to be free from excessive force, but the issue is whether the shooter should have known that the figure he shot was a fellow officer).  "Failure to train must be

aimed at [the shooter's] lack of training and not at the deficiencies in [the bystander police's] or [the victim officer's] training, and must allege that [the shooter's] lack of training caused him to take actions that were objectively unreasonable." *Young*, 404 F.3d 4 at 27.

Whether there is constitutionally deficient training in a friendly-fire case is determined by the training provided to the shooter, not the victim. The issue is whether the deficiencies in Jones's training caused him to take actions that were objectively unreasonable when he shot Pickens. In some cases, the victim's training could be relevant to show that the shooter's lack of training was part of a policy of not training on on-duty/off-duty interactions, but in this case, the training given Pickens was the responsibility of the Precinct 6 Constable, while Jones's training was the responsibility of the Sheriff's Department.

Other aspects of *Young* are distinguishable from this case. In *Young*, the court emphasized that the municipality had a policy requiring an off-duty law enforcement officer to be "always on and always armed," a policy that witnesses described as inherently dangerous. The court found that this policy created a need to train on-duty officers that off-duty officers who attempt to intervene in crime suppression should not be mistaken for suspects. The policy that was involved in *Young* was different from the policy in the present case. In *Young*, the officers were not only required to be always on duty, they were also required to carry firearms while off-duty. In the present case, the state law required off-duty officers to be "always on duty," but allowed rather than required them to carry a gun. The

36

policy at issue in the present case is less rigid than the policy at issue in *Young*.[22]

No case holds that an "always on duty" policy, even with a requirement of "always armed," is in itself unconstitutional. Nor does any case hold that a policy like the Texas law in this case forbidding an off-duty reserve officer from wearing visible police identification is in itself unconstitutional. Rather, the cases explore whether given the "always on duty" policy and the fact that off-duty or plainclothes officers are not uniformed, it is unconstitutional for a municipality to fail to have protocols and provide training on avoiding misidentification of such officers. *Young*, 404 F.3d 4. The same risk of misidentification applies to plainclothes on-duty officers as well as plainclothes off-duty officers. *Ngo*, 2006 WL 1579873.

A review of the record does not support a conclusion that, as a matter of law, the training in on-duty/off-duty or plainclothes encounters was constitutionally deficient or that Harris County was deliberately indifferent in not providing additional or better training. The plaintiffs are correct that the law-enforcement witnesses recognized a risk of misidentifying off-duty or plainclothes officers who are armed and intervene in police actions. The Sheriff's Department recognizes misidentification of off-duty officers as an "inherent danger in the business." (Docket Entry No. 76, Ex. Q at 25). The Rule 30(b)(6) representatives of the Sheriff's Department and the Constable acknowledged potential problems with

---

[22] In *Young*, the court notes that after the shooting and the lawsuit, the city changed the "always armed" policy to allow officers discretion. 404 F.3d 19-20. Unlike the Harris County Constable, the Harris County Sheriff's Department does have an "always on duty/always armed" policy. (Docket Entry No. 76, Ex. Q 30–35). That policy, however, is irrelevant to facts of this case because the deputy sheriffs were on duty and uniformed when Pickens was shot.

misidentification of plainclothes officers, including that an armed plainclothes officer could appear to be an immediate threat to other officers.  (*Id*. at 39; Docket Entry No. 76, Ex. P at 36–37; Ex. Q. at 37).  The law-enforcement witnesses agreed with the plaintiffs that there is no "particularized" training module or unit devoted specifically to telling uniformed on-duty officers how to identify plainclothes or off-duty officers in the field.  Although he lacked particularized training in recognizing plainclothes officers, Jones, a fifteen-year police veteran at the time of the shooting, had a total of 2123 hours of training, including 60 hours in use-of-force training.  (Docket Entry No. 65, Ex. J at 3).  Jones had some training in on-duty/off-duty encounters.  (Docket Entry No. 78, Ex. H at 69; Docket Entry No. 76, Ex. Q at 23, 25, 41, 42).  Jones was aware of the risk of misidentifying officers who are not in uniform.  "I've taken numerous classes, street survival classes, and that's just general practice to identify yourself who you are if you're out on undercover status."  (Docket Entry No. 76, Ex. A at 31–32).  This evidence undermines the plaintiffs' argument that Harris County has ignored an obvious need for additional "particularized" training on off-duty or plainclothes officer identification.

Nor does the record show that any additional or different training would have resulted in Jones viewing Pickens as anything other than an armed suspect.  The plaintiffs have not raised a fact issue as to whether Jones's lack of "particularized" training on recognizing off-duty officers intervening in police actions would have avoided the shooting.  No information available to Jones suggested that Pickens was a law-enforcement officer.  Pickens did not in any way identify himself as a deputy constable.  Instead, Pickens joined in a chase, at

night, carrying a gun.  In other cases in which courts have found a basis for a jury to conclude that an officer's training caused him to unreasonably mistake a plainclothes officer for a suspect, the shooter had some evidence of the victim's identity.  For example, in *Young*, the off-duty officer identified himself as a police officer.  In *Ngo,* the plainclothes officer was described as such in dispatch calls and was wearing identifying clothing and waving down the police car.  In the present case, Pickens did not identify himself as an officer and there was no information available to the deputies that indicated Pickens's status.  No deputy realized that Pickens was an off-duty officer until after the shooting.  In *Young* and *Ngo*, by contrast, others on the scene recognized the victim as an officer before the shooting.

The inability to show a causal link between the training Jones recieved and his failure to identify Pickens as an off-duty officer is not the only basis to distinguish *Young*.  As noted, in *Young*, the off-duty officers operated under a more rigid "always on, always armed" policy than was present in this case.  In *Young*, the First Circuit applied a different standard for deliberate indifference than the Fifth Circuit follows. "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Young*, 396 F. Supp. 2d at 136 (quoting *Camino-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998)).  By contrast, in the Fifth Circuit,  "deliberate indifference" is a stringent standard of fault, requiring "proof that a municipal actor disregarded a known or obvious consequence of his action."  As a result, a plaintiff "usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional

violation." The failure to train must reflect a "'deliberate' or 'conscious' choice to endanger constitutional rights." *Estate of Davis v. City of North Richland Hills*, 406 F.3d at 381, 383 (internal quotations and citations omitted). The present record does not show deliberate indifference under the Fifth Circuit standard.

The record does not show a pattern of misidentification that would put Harris County on notice of an obvious need for additional, particularized training, so as to make the failure to provide it deliberate indifference. The defendants offer evidence of three previous friendly-fire incidents, two involving plainclothes on-duty officers, and one involving a uniformed on-duty officer. (Docket Entry No. 65 at 14). Pickens is the first off-duty law-enforcement officer in Harris County to be shot by on-duty officers. (Docket Entry No. 65 at 14). The plaintiffs did not produce any additional evidence of friendly-fire shootings.

"[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts*, 397 F.3d at 293. (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)). "[It will not] suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. . . . And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Pineda,* 291 F.3d at 333 (citing *City of Canton*, 489 U.S. at 391). The plaintiffs offer no evidence that inadequate training in on-duty/off-duty officer encounters caused Jones to shoot Pickens. The plaintiffs offer suggestions as to additional training for off-duty officers

40

like Pickens, not on-duty officers like Jones.  (Docket Entry No. 76, Ex. R at 1–2).  The record does not support a finding that a particular defect in Jones's training caused him to act in an objectively unreasonable way.   In this case, unlike *Young*, the record does not raise a fact issue as to whether, had Jones received specific additional or different training, he would have recognized Pickens as an officer and the shooting would not have occurred.  Summary judgment is granted on the failure-to-train and related claims.

## V.      The Due Process Claim

The plaintiffs assert a due process violation as an additional basis for municipal liability under section 1983.  (Docket Entry No. 82).  Neither excessive force nor a lack of training that allegedly contributed to excessive force support a due process claim.  In *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), a widow sued under section 1983 after her husband, a sanitation worker, died working in a hazardous sewer line.  The Supreme Court found that Collins had no constitutional right to a safe work environment or to training based on its hazards.  *Id.* at 126; *see also Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 1998) (finding that *Collins* did not strip an officer of a claim for excessive force resulting from friendly fire, but applying the Fourth Amendment, not the Due Process Clause).

The plaintiffs also allege a due process violation akin to *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), for excessive force.  The Supreme Court has rejected the application of due process analysis in excessive force cases.  "[C]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [are]

41

analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395 (1989).  After *Graham,* "if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under substantiative due process." *Lewis*, 523 U.S. at 833.  The more specific Fourth Amendment reasonableness standard applies, not a substantiative due process claim.  *Graham*, 490 U.S. 386; *Ballard*, 44 F.3d 391.  Summary judgment is granted as to all the plaintiffs' due process claims against the defendants.

## VI.    The State-Created Danger Claim

The plaintiffs claim that Harris County can be held liable under a section 1983 due process theory of state-created danger, allegedly recognized by the Fifth Circuit in *Morin v. Moore*, 309 F.3d 316 (5th Cir. 2002).  (Docket Entry No. 76 at 42).   In *Morin*, the court identified the theory as one in which "(1) the state actors created or increased the danger to the plaintiff and (2) the state actors acted with deliberate indifference." *Id.* at 321–22.  In *Morin*, the Fifth Circuit affirmed the lower court's refusal to apply the state-created danger doctrine because the plaintiff failed to show "actual knowledge of a specific risk of harm to a known victim." *Id.*  The present record also fails to meet the *Morin* standard.  The plaintiffs have produced no showing that Harris County was aware of the danger to Pickens as a "known victim."  309 F.3d at 322.

The Fifth Circuit has since noted its rejection of state-created danger liability:

> [The Fifth Circuit] has frequently spoken of the "state-created danger" theory, and has discussed its various permutations and requirements as applied in other circuits, but neither the Supreme Court nor this court has ever adopted the state-created danger theory or sustained a recovery on the basis thereof.  We have, however, refused to allow recovery sought to be predicated thereunder.

*Rios v. City of Del Rio*, 444 F.3d 417, 422 (5th Cir. 2006).  The Fifth Circuit listed six other cases in which the circuit had rejected the theory: *Beltran v. City of El Paso,* 367 F.3d 299, 307 (5th Cir. 2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1093 liability"); *Rivera v. Houston Independent School District*, 349 F.3d 244, 249 (5th Cir. 2003) ("We have never recognized state-created danger as a trigger of State affirmative duties under the Due Process clause"); *Piotrowski v. City of Houston*, 237 F.3d 567, 584 (5th Cir. 2001) ("Although this court has discussed the contours of the 'state-created danger' theory on several occasions, we have never adopted that theory"); *Randolph v. Cervantes,* 130 F.3d 727, 731 (5th Cir. 1997) ( "The state-created danger theory has not been adopted in this Circuit"); *Johnson v. Dallas I.S.D.*, 38 F.3d 198, 201 (5th Cir. 1994) ("no Fifth Circuit case has yet predicated relief on a state created danger theory"); *Leffall v. Dallas I.S.D.*, 28 F.3d 521, 530 (5th Cir.1994) ("We have found no cases in our circuit permitting § 1983 recovery for a substantive due process violation predicated on a state-created danger theory").

Summary judgment is granted as to the state-created danger claim.

## VII.   Ratification Liability

The plaintiffs claim that because "Harris County has admitted that it approves of the means, manner, and method in which Jones shot and killed Pickens," Harris County is liable under a theory of ratification.  The plaintiffs rely on the Sheriff's Department Rule 30(b)(6) representative's deposition testimony that he believed Jones "would have been justified in that circumstance [] because he would have reasonably perceived a person pointing a gun at him to be a threat, an immediate threat."  (Docket Entry No. 76 at 44; Ex. Q at 59–60).  The plaintiffs cite *St. Louis v. Praprotnik*, 485 U.S. 112 (1988), in which the Supreme Court found that when "the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *Id.* at 127.

This circuit noted that *Praprotnik* "carefully distinguished between those having mere decisionmaking authority and those having policymaking authority."  *Gelid v. Hous. Auth. of New Orleans*, 456 F.3d 525, 529 (5th Cir. 2006) (citing *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1246 (5th Cir. 1994)).  "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."  *Praprotnik*, 485 U.S. at 130.  "[T]he Supreme Court has precluded the possibility of finding a county employee to possess 'de facto policymaking authority.'" *Flores v. Cameron County*, 92 F.3d 258 (5th Cir. 1996) (citing *Praprotnik*, 485 U.S. at 131).  "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability."  *Praprotnik*, 485 U.S. at 126.

The record does not show that the Sheriff's Department ratified Jones's split-second

decisions that led to the shooting, so as to give rise to municipal liability.   Summary judgment is granted as to the ratification claim.

## VIII.   Conclusion

The defendants' motion for summary judgment is granted.  Because the federal claims are dismissed, this court declines to decide the state-law claims the plaintiffs have asserted. The state-law claims are dismissed without prejudice.[23]

This case is dismissed by separate order.

SIGNED on November 2, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

---

[23]"Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Premiere Network Servs., Inc. v. SBC Comm'ns, Inc.*, 440 F.3d 683, 692 (5th Cir. 2006) (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir.1992)).